IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH CASTAGNO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KNORR-BREMSE AG; KNORR BRAKE COMPANY; NEW YORK AIR BRAKE LLC; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; FAIVELEY TRANSPORT NORTH AMERICA, INC.; RAILROAD CONTROLS, L.P.; and XORAIL, INC.<br><br>Defendants. | Case No. __18-1212__<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Joseph Castagno, individually and on behalf of a class of all those similarly-situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants Knorr-Bremse AG, Knorr Brake Company (collectively, Knorr) New York Air Brake LLC, Westinghouse Air Brake Technologies Corporation ("Wabtec"), Faiveley Transport North America, Inc. ("Faiveley"), Railroad Controls, L.P. ("Railroad Controls") and Xorail, Inc. ("Xorail"), based on Defendants' and unnamed coconspirators' unlawful conspiracy to suppress Plaintiff's and Class members' compensation, and further alleges as follows:

**I.    SUMMARY OF ALLEGATIONS**

1.    This class action challenges an illegal conspiracy among the world's dominant rail equipment suppliers to restrain competition in the labor markets in which they compete for the

1

service of rail equipment employees. Beginning in 2009, Defendants entered into express agreements to eliminate or reduce competition amongst them for skilled labor (the "Conspiracy").

2. Knorr, Wabtec, and Faiveley were the three largest rail equipment suppliers in the world and were direct competitors. The intended and actual effect of the Conspiracy was to suppress employee compensation, and reduce employee mobility.

3. The Conspiracy was first revealed publicly on April 3, 2018, with an announced action and settlement by the U.S. Department of Justice ("DOJ") with Knorr and Wabtec.[1] The settlement prohibits Wabtec and Knorr from entering, maintaining, or enforcing no-poach agreements, subject to limited exceptions.

4. This action seeks treble damages for Defendants' *per se* violation of Section 1 of the Sherman Antitrust Act 15 U.S.C. § 1 *et seq*. and equitable relief.

## II. JURISDICTION AND VENUE

5. Plaintiff brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

7. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more Defendants reside in, can be found in, and/or transact business in this District.

---

[1] *United States of America v. Knorr-Bremse AG*, No. 18-cv-00747 (D.D.C.) (Apr. 3, 2018).

8.	Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Pennsylvania. In particular, each Defendant, either directly or through the ownership and control of its U.S. subsidiaries: (a) transacted business throughout the United States, including in this District; (b) had substantial aggregate contacts with the United States as a whole, including in this District; (c) carried out conspiratorial schemes in the United States, including in this District; and/or (d) engaged in an illegal conspiracy to restrain competition for rail-equipment employees that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

9.	Throughout the relevant period, Defendants employed Class members throughout the United States, including in this District.

10.	The anticompetitive conduct engaged in by Defendants and their co-conspirators substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

11.	This anticompetitive conduct affected all workers and Class members employed by Defendants, not just individuals who would have been solicited. Labor competition in the rail and freight industry is nationwide. Defendants considered each other's compensation packages to be competitively relevant regardless of location, and many Class members may have moved between states to pursue employment opportunities.

12.	Defendants' conduct substantially affected interstate commerce throughout the United States, and caused antitrust injury throughout the United States.

## III. THE PARTIES

13.	Plaintiff Joseph Castagno, a resident and citizen of Florida, worked as an employee of Wabtec subsidiary Xorail from March 2015 to December 2015 in the position of signalman,

3

and for Wabtec subsidiary Railroad Controls from January 2016 through November 2016 in the position of signalman.

14. Defendant Knorr-Bremse AG is a privately-owned German company with headquarters in Munich, Germany. Knorr-Bremse AG is a leading manufacturer, developer, and seller of rail and commercial vehicle equipment, and wholly-owns subsidiaries in the United States. Knorr-Bremse AG had annual revenue of $7.7 billion in 2017, and has approximately 28,000 employees globally.

15. Defendant Knorr Brake Company is a Delaware corporation with headquarters in Westminster, Maryland, and is a wholly-owned subsidiary of Defendant Knorr-Bremse AG. It manufactures equipment used on trains, including train control, braking, and door systems.

16. Defendant New York Air Brake LLC is a Delaware corporation with headquarters in Watertown, New York, and is a wholly-owned subsidiary of Defendant Knorr. It manufactures railway air brakes and other railway equipment.

17. Defendant Westinghouse Air Brake Technologies Corporation is a Delaware corporation headquartered in Wilmerding, Pennsylvania, and is a leading provider of freight and passenger rail equipment and services. Wabtec has over 100 subsidiaries globally and is the largest global provider of rail equipment and services, with global revenues of $3.9 billion in 2017. Wabtec employs approximately 18,000 full-time employees worldwide. Wabtec Passenger Transit is a business unit of Wabtec, and is based in Spartanburg, South Carolina.

18. Defendant Faiveley Transport North America, Inc., formerly a subsidiary of Faiveley Transport S.A., is now a wholly-owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. Wabtec acquired Faiveley Transport S.A. in November 2016, which had been based in France. Prior to the acquisition, Faiveley

4

Transport S.A. was the world's third-largest rail equipment supplier behind Wabtec and Knorr. It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016. In the United States, Faiveley Transport S.A. conducted business primarily through Defendant Faiveley Transport North America, Inc.

19.     Defendant Railroad Controls L.P. is a leading provider of railway signal construction services to freight and passenger railroads in North America. Railroad Controls was wholly acquired by Wabtec on February 4, 2015.

20.     Defendant Xorail Inc. provides signal engineering and design services. It was acquired by Wabtec in March 2010.

21.     Each Defendant co-conspirator acted as the principal of or agent for each other Defendant co-conspirator with respect to the acts, violations, and common course of conduct alleged herein.

22.     Upon information and belief, various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and the identities of which are presently unknown, have participated as co-conspirators with the defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and entities at a later date.

23.     Whenever, in this Complaint, reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees

5

or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## IV.  SUBSTANTIVE ALLEGATIONS

### Competition for Employees in the Rail Industry

24. Knorr and Wabtec are the world's two largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications. Until its acquisition by Wabtec in 2016, Faiveley was the world's third largest supplier.

25. Defendants are some of the largest employers in the rail industry. By the end of 2017, Wabtec and its subsidiaries employed approximately 18,000 full-time employees worldwide. In 2016, it added approximately 5,700 employees through the acquisition of Faiveley. By the end of 2017, Knorr and its subsidiaries employed approximately 27,700 employees worldwide, including approximately 5,000 employees in the Americas.

26. There is high demand for and limited supply of employees who have rail industry experience. As a result, firms in the rail industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening. Employees of other rail industry participants, including the employees of Defendants' customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

27. Solicitation of lateral hires -- directly soliciting employees from another rail industry participant -- are a particularly efficient and effective method of competing for qualified employees. Solicitation for railway employees involves communicating directly by phone, e-mail, social and electronic networking, or in person, with another company's employee who has not

otherwise applied for a job opening. Solicitations are performed by in-house and external recruiters.

28. Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary. Rail companies often look to their professional networks to fill a vacancy.

29. In a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract skilled talent for their employment needs. This competition benefits employees because it increases the available job opportunities that employees learn about, and improves employees' ability to negotiate better compensation.

30. Competition for lateral hiring is critical to the growth and maintenance of employee wages because lateral hiring is preferred by employers to hiring an untested employee fresh out of a training program. In a lateral hire, the hiring-employer benefits from training paid for by its rival, and also puts the employer at a disadvantage for losing an employee. Moreover, when an employee leaves for a competitor, it often motivates co-workers to consider lateral moves as well. In many instances, managerial employees or team leaders will take their entire team to a new company. In addition, when employees leave to join a competitor, it boosts the bargaining power of the remaining employees. A properly functioning competitive market for employees forces employers to preempt lateral departures by maintaining or increasing wages and benefits. Accordingly, an agreement that impedes lateral hiring will materially suppress wages.

31. The positive compensation effects of hiring employees from competitors are not limited to the individuals who seek new employment, or to the individuals who would have sought new positions. The effects of hiring from competitors impact all employees positively, and any agreement that impedes lateral hiring will harm all employee wages.

32. Because of the significant economic and societal harm posed by agreements that impede competitive labor markets, in October 2016, the Antitrust Division of the DOJ and the Federal Trade Commissions issued Antitrust Guidance for Human Resource Professionals ("Guidance"). The Guidance stated that no-poach and wage-fixing agreements will generally be treated as criminal antitrust offenses going forward, and that:

> Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects."

Guidance at 3.

33. The express no-poaching agreements that underlie this class action were the first to be targeted by the DOJ after it issued its guidance.

**Defendants Enter Into Express Anti-Poaching Agreements**

34. Defendants entered into the Conspiracy to limit competition between them by agreeing not to solicit, recruit, or hire without prior approval. The agreements were not reasonably necessary to serve any separate, legitimate purposes for business transactions or collaborations between the companies.

35. Defendants made the express agreements with knowledge of the other Defendants' participation and with the intent of reducing employee compensation by eliminating competition for skilled labor.

### The Wabtec-Knorr Agreement

36. Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that

8

involved promises and commitments not to solicit or hire each other's employees. These no-poach agreements restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

37. Beginning no later than 2009, Wabtec and Knorr Brake Company's senior executives entered into an express no-poach agreement and actively implemented it through direct communications with each other. For example, in a letter, dated January 28, 2009, a director of Knorr Brake Company wrote to a Wabtec senior executive: "[Y]ou and I both agreed that our practice of not targeting each other's employees is a prudent cause for both companies. As you so accurately put it, 'we compete in the market.'"

38. Knorr-Bremse AG senior executives were aware of the agreement between its subsidiary Knorr Brake Company and Wabtec. Top Knorr executives in Germany were included in key communications about this no-poach agreement.

39. In furtherance of their agreement, Wabtec and Knorr Brake Company each instructed their outside recruiters not to solicit employees from the other company.

40. In at least some instances, Wabtec and Knorr Brake Company's no-poach agreement prevented them from considering unsolicited applications from the other firm's employees unless the other company gave approval. For example, in 2010, a Knorr Brake Company senior executive stated that, without the permission of his Wabtec counterpart, he would not consider the application of Wabtec employees who had applied to Knorr Brake Company.

41. Wabtec and Knorr subsidiaries participated in the Conspiracy. For example, in July 2012, a New York Air Brake senior executive stated that he could not consider the application of Wabtec employees due to Wabtec and Knorr's no-poach agreement.

9

42. Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited an individual at Knorr Brake Company for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

**The Knorr-Faiveley Agreement**

43. Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America reached an express no-poach agreement that included commitments to contact each other before pursuing employees of the other company. For example, in October 2011, a Knorr Brake Company senior executive stated in an email to an executive at Knorr-Bremse AG that a conversation with a Faiveley Transport North America executive had "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at Knorr Brake Company and Faiveley Transport North America actively managed the agreement with each other through direct communications.

44. In or about 2012, executives from Knorr Brake Company and Faiveley Transport North America discussed the no-poach agreement at a trade show in Germany. Thereafter, the executives enforced the agreement through direct communications with each other and other senior executives at the two companies.

45. This no-poach agreement was known to other senior executives at the companies, who directly communicated with one another to ensure compliance. For example, in October 2012, Faiveley Transport North America executives stated in an internal communication that they were required to contact Knorr Brake Company before hiring a train brake engineer in the United States.

### The Wabtec-Faiveley Agreement

46. Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement, which included commitments to notify and obtain approval from each other before hiring each other's employees.

47. Executives from these two companies enforced their no-poach agreement through direct communication. For example, in January 2014, a Wabtec Passenger Transit executive explained to his colleagues that he could not engage in hiring discussions with Faiveley Transport North America employees without first getting permission, stating that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]."

48. Similarly, one month later, another Wabtec Passenger Transit executive informed his staff that hiring Faiveley Transport North America's employees was "off the table" due to the no-poach agreement.

49. Wabtec announced its intent to acquire Faiveley in July 2015, and closed the acquisition on November 30, 2016.

## IV. CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action on behalf of himself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

11

> All natural persons who were paid for personal services by any of the Defendants, or by any wholly-owned subsidiary of any Defendant, including Defendants' employees or contractors, at any time from January 1, 2009, to April 3, 2018. Excluded from the Class are senior executives and employees in the human resources and recruiting departments of the Defendants and their wholly-owned subsidiaries, and employees hired outside of the United States to work outside of the United States.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

51. Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but based upon the number of people employed by defendants, the nature of trade and commerce involved, and the scope and duration of the conspiracy, Plaintiff believes that there are thousands of Class members, and that Class members are geographically dispersed throughout the United States. Joinder of all members of the Class is not practicable.

52. The questions of law or fact common to the Class include, but are not limited to:

    (a) whether the Conspiracy violated the Sherman Act;

    (b) whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

    (c) whether Defendants fraudulently concealed their conduct;

    (d) whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

    (e) whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

    (f) the type and measure of damages suffered by Plaintiff and the Class.

53. These and other questions of law and fact are common to the Class, and these predominate over any questions affecting only individual Class members, and resolving these questions will resolve them for all Class members.

54. Plaintiff's claims are typical of the claims of the Class.

55. Plaintiff will fairly and adequately represent the interests of the Class and has no conflict with the interests of the Class.

56. Plaintiff has retained competent counsel experienced in antitrust and complex class action litigation to represent himself and the Class.

57. Defendants and the unnamed co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

58. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## V. PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY AS A RESULT OF THE CONSPIRACY

59. The Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of artificially depressing the compensation paid to their employees.

60. Plaintiff and each member of the Class were harmed by every agreement alleged herein. The elimination of competition and suppression of compensation due to the Conspiracy affected all Class members.

61. The harm not only reached individuals who did, or otherwise would have, changed companies, but also extended to those who had no intention of leaving their companies, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

62. While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for rail equipment manufacturers and suppliers in the United States.

63. Wabtec and Knorr, along with their many subsidiaries, are the two largest competitors in this market—and, before its acquisition by Wabtec, Faiveley was the third-largest—and they possess significant market power. Acting in concert, Defendants and unnamed co-conspirators have the power to suppress compensation and eliminate competition in the relevant market.

64. Through their Conspiracy, Defendants exercised and maintained this power to suppress compensation and eliminate competition. The Conspiracy substantially affected interstate commerce throughout the U.S. and caused antitrust injury throughout the U.S.

## VI. DEFENDANTS' FRAUDULENTLY CONCEALED THE CONSPIRACY; THE STATUTE OF LIMITATIONS SHOULD BE TOLLED

65. Plaintiff and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least April 3, 2018, when the DOJ's settlement with Defendants became public.

66. Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiff or the Class on inquiry notice of the no-poach agreements. Plaintiff and Class members have no reason to suspect that Defendants illegally conspired to suppress wages and the labor market.

14

67. Defendants took active steps to keep their Conspiracy hidden and carried it out in a manner specifically designed to avoid detection. Defendants' discussions in furtherance of the Conspiracy often occurred through direct, private conversations between senior executives or through email exchanges between senior executives or recruiters. Defendants relied on non-public forms of communication (e.g., private email) to effectuate their Conspiracy and to avoid disclosure of the full scope of the Conspiracy beyond the individuals involved.

68. Before the DOJ's announcement, none of the relevant communications between Defendants were public or could have been known to Plaintiff.

69. As a result of Defendants' successful efforts to conceal the fact and scope of the No-Poach Conspiracy, the running of any applicable statute of limitations has been tolled until April 3, 2018 with respect to Plaintiff's claims concerning Defendants' Conspiracy.

## CLAIM I.

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

70. Plaintiff incorporates by reference the allegations in the preceding paragraphs, and further alleges the following:

71. Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72. Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

73. As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, Plaintiff and members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

15

74. The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

> (a) competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and
>
> (b) Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

75. The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

76. Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

77. Accordingly, Plaintiff and Class members seek three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing the suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## VII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. For an order certifying that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel as Class counsel;

16

B. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

   (1) An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

   (2) A *per se* violation of Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under federal antitrust laws, including treble damages, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. Defendants be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. Plaintiff and members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F. Plaintiff and members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G. Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

17

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues so triable.

Dated: September 11, 2018

Respectfully submitted,

/s/ David B. Spear
David B. Spear
PA ID. #62133

**MINTO LAW GROUP, LLC**
Two Gateway Center
603 Stanwix Street, Suite 2025
Pittsburgh, PA 15222
Telephone: (412) 201-5525
dspear@mintolaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
**SPECTOR ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300

Peggy Wedgworth
Andrei V. Rado
Matthew A. Kupillas
**MILBERG TADLER PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, Suite 1920
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
arado@milberg.com